554 So.2d 454 (1989)
Earl Jerome McGAHEE
v.
STATE.
2 Div. 587.
Court of Criminal Appeals of Alabama.
May 12, 1989.
Rehearing Denied June 16, 1989.
*456 Bruce Boynton, Selma, for appellant.
Don Siegelman, Atty. Gen., and William D. Little, Asst. Atty. Gen., for appellee.
TYSON, Judge.
In October of 1985, Earl Jerome McGahee was indicted on two counts of capital murder. Count I of the indictment alleged that the appellant "did intentionally cause the death of Connie Brown by blunt force trauma to her head and Earl Jerome McGahee caused said death during the time that Earl Jerome McGahee did subject or attempt to subject, Connie Brown to sexual contact by forcible compulsion in violation of Section 2(a)(8) of Act No. 81-178, against the peace and dignity of the State of Alabama." (R. 366)
Count Two of the indictment alleged that the appellant "by one act or pursuant to one scheme or course of conduct, did intentionally cause the death of Connie Brown, by blunt force trauma to her head, and did intentionally cause the death of Cassandra Lee by shooting her with a pistol, in violation of Section 2(a)(10) of Act No. 81-178." (R. 1366)
The jury found this appellant guilty on both counts of the indictment and recommended, by a vote of eleven to one, that the appellant be sentenced to death. The trial judge accepted the jury's recommendation and sentenced the appellant to death by electrocution.
On September 11, 1985, Connie Brown (the appellant's ex-wife), Cassandra Lee and Dee Ann Duncan were all nursing students at George C. Wallace Junior College in Selma, Alabama. That morning, Brown, Lee and Duncan were in a class of thirty-four students in a classroom in the Science Building at the junior college. At approximately 10:00 that morning, the appellant came to this classroom and asked to see Brown. The instructor, Shelia Guidry, told Brown that she could leave the classroom. Brown left the room with the appellant and she went to the office of Joyce Howell, a secretary at the college, and asked to use the telephone. Brown appeared nervous and Howell helped Brown dial the phone *457 numbers. Brown made calls to an elementary school and to her mother. The appellant came into the office while Brown was making the phone calls. As a result of her conversation with Brown, Howell called campus security to remove the appellant from the campus. Howell then walked Brown back to her classroom.
While Brown was out of the classroom, Guidry had recessed the class for a short break. Brown returned to the class at the end of the break and took her seat. Many of the students were in the classroom at this time because they had remained in the room during break or they had returned from the break.
Brown sat directly in front of Lee and to the right of Duncan. Shortly after Brown returned to the classroom, the appellant McGahee appeared at the door and asked Brown to come outside. Brown refused.
At this point, the appellant entered the classroom and shut the door. He pulled a pistol from his pants and aimed it at Brown. A shot was fired and the appellant began walking towards Brown. All of the students began fleeing the classroom. Lee was unable to leave the classroom because Brown fell across her desk and then she (Lee) was shot by the appellant. Duncan fell as she was leaving the classroom and remained on the floor and acted hurt.
Brown struggled to the front of the classroom and fell to the floor. The appellant then began kicking and stomping Brown.
Dana Andrews was walking down a hallway in the Science Building that morning when she saw the students running out of Guidry's classroom and heard gunshots. She went to the room to see if she could help and pushed open the classroom door. Andrews saw the appellant "leaning over and he had her [Brown's] legs lifted up with his left arm and he had his right arm, he was pulling her panties off." (R-474).
Ferrin Eiland, an instructor at the college, went to Guidry's classroom when he heard the students screaming. He looked through the door window and saw Brown lying on the floor naked. Brown's legs were propped up and parted and the appellant was kneeling between her legs. Eiland saw the appellant strike Brown twice on the chest with his fists.
Charles Duckett, also an instructor at the college, went to Guidry's classroom when he heard there had been a shooting. Duckett looked in the door window and saw the appellant block the door with a chair. When Duckett heard several shots, he went downstairs and told Eiland to call an ambulance. When he returned to the classroom door, he saw the appellant with a gun in his hands and his hands were bloody. Duckett asked the appellant if he could help the people who were hurt and the appellant replied that no one was hurt and then waved the gun at Duckett.
While Dee Ann Duncan was lying on the floor pretending to be hurt, she heard the appellant say to Brown, "Get up, Bitch" (R. 780). He told Brown that nothing was wrong with her and he began kicking her. He then said several times, "give it to me like you had used to" and "you make my d___ hard" (R-781). Duncan noticed that Brown did not have her jeans on.
At some point, the appellant came over to Duncan and put his hands between her legs and began rubbing them. He then jerked her head up and asked her what was wrong. The appellant began striking Duncan's head with the pistol and Duncan blacked out.
Truett McGee testified that he went to 1410 Philpott in Selma on the morning in question to investigate an unauthorized use of a motor vehicle. He was told by a Mrs. Redd that the appellant had taken her car. Mrs. Redd was a relative of the appellant. While McGee was investigating this incident, he received a call that there had been a shooting at the college.
McGee proceeded to the college and went to the classroom in the Science Building. When he looked through the door window, the appellant pointed a pistol at him. McGee then heard a shot. McGee told the appellant to throw out his pistol and come out of the classroom. The appellant complied and was arrested and taken into custody.
*458 Officer Jerry Ward of the Selma Police Department then took the appellant to a patrol car and read him his Miranda rights. While he was being transported to the police station, the appellant began talking. He stated, "Well, if the son of a bitch lives, it ain't my fault cause I gave her a free ticket to heaven. If the son of a bitch lives it's a miracle. It's only because Jesus must want her to." (R-761, 763). The appellant further stated that things didn't work out like he wanted them to so he "started busting caps (R. 763)." He told the police that, if he had taken all the shells in the classroom that he had in the car, the police would not have taken him alive.
When the police entered the classroom after the appellant had been taken into custody, they discovered Lee, Brown and Duncan in the classroom. Brown was already dead and Lee and Duncan were injured and were transported to Selma Medical Center.
Lee arrived at the hospital with multiple (five) gunshot wounds to her body. When she arrived at the hospital, Lee had no palpable blood pressure, she had suffered some blood loss and she was paralyzed from the waist down. Lee was resuscitated with fluids and given two pints of blood. Surgery was performed on Lee to repair an injury to her spleen. One of the gunshots caused an air leak in Lee's lungs but surgery could not be performed on the lungs because Lee's condition was not stabilized. After surgery, Lee's family requested that Lee not receive any more blood transfusions because she was a Jehovah's Witness.
Lee died on September 21, 1985 as a result of complications from the gunshot wounds, i.e., meningitis and adult respiratory distress syndrome. Medical experts testified that the fact that Lee did not receive any more blood transfusions after her family's request did not contribute to her death because they were able to compensate for any blood loss by other means.
Duncan suffered a depressed skull fracture but survived. As a result of her injury, she lost the ability to taste and smell.
An autopsy performed on Brown revealed that she died as a result of repeated blows to the face and head which resulted in multiple fractures to the skull and subsequent injury to the brain. Dr. Allen Stillwell, a forensic pathologist, testified that these injuries would be consistent with Brown's being hit with the butt handle of the gun and being stomped with a foot. He further stated that Brown had been strangled. Brown also received blunt trauma injuries to her upper abdomen area as well as two gunshot wounds to her left arm. However, these injuries were of a non-fatal nature. Stillwell found no evidence in Brown's body of recent sexual activity.
Lonnie Ray Hardin, a firearms and toolmarks expert with the Department of Forensic Sciences, testified that the bullets removed from Lee's and Brown's bodies by Dr. Stillwell were fired through the same .357 Magnum gun which the appellant threw out of the classroom. The hammer of this gun was found on the floor in the classroom. Hardin testified that it would take a considerable amount of force to dislodge the hammer from the gun. The State then rested its case.
The appellant's first three witnesses were the psychiatrists who examined him at the Taylor Hardin Secure Medical Facility and who served on the Lunacy Commission.
Drs. Omar Mohabbott, Marino S. Tulao and Kamal Nagi all testified that, based on their examinations of this appellant McGahee, they found him competent to stand trial. Drs. Tulao and Nagi stated that they also found the appellant to be sane at the time these offenses were committed. Dr. Mohabbott testified that he did not examine the appellant concerning his sanity at the time of these offenses.
Elizabeth Marie Sapala, a private psychiatrist appointed to assist the defense, testified that, although she found the appellant to be competent to stand trial, she believed the appellant lacked the capacity to conform his conduct to the requirements of law at the time of this offense. She stated that the appellant was unable to resist the rage inside of him due to several stress factors, i.e., the appellant's unemployment, *459 his financial situation, his divorce from Brown and subsequent custody disputes over their child, his problems with his mother and his substance abuse.
The appellant testified that he first met Brown when she was pregnant with her first child, Anwon, whom the appellant later adopted after he and Brown were married. Brown and the appellant became friends and later married on September 12, 1980. The appellant testified that the marriage took place because Brown told him she was pregnant but the appellant later learned that she was not pregnant. Brown then became pregnant and had a child by the appellant, named Earl Jerome McGahee, Jr. The appellant and Brown lived in New Orleans, Louisiana, because the appellant was in the Coast Guard and was stationed there. While there, the appellant pleaded guilty to a child abuse charge and received counseling. He testified that Brown treated him badly when they lived in New Orleans. She would invite relatives to stay with them for long periods of time without his permission. He found his wife at home one day dressed in a nightgown and a man was in the house. One day the appellant came home and Anwon ran up to him and called him "Daddy." Brown told Anwon to get away from the appellant because he wasn't Anwon's father. The appellant stated he got mad and accidentally hit Anwon. Brown left the house with the two children and had the appellant arrested for cruelty to a juvenile. The appellant pleaded guilty to that charge and served twelve months and twelve days in jail.
Brown returned to Selma after the appellant was arrested. She divorced the appellant and took back her maiden name, Brown.
When the appellant was released from jail, he returned to Selma and lived with his mother while attending George C. Wallace Junior College. In July of 1985, the appellant's mother "kicked him out of the house" and filed reckless endangerment charges against him.
On the day in question, the appellant went to his mother's house to talk to his sister. As he was leaving, he noticed the keys to his mother's car. He took the keys and drove the car to the college. He then went to Brown's classroom and asked her to get Earl, Jr., out of school so that he, the appellant, could see him. Brown called the school and then told the appellant he couldn't take Earl, Jr., from the school.
The appellant then went back to his mother's car and got her gun. He went to the classroom to see Brown but she would not talk to him. He pulled the pistol from his pants and said, "What about now?" (R. 968). Brown jumped up and the appellant pulled the trigger. The appellant then "went upside her head" with the pistol and kicked her in the head. He stated he removed Brown's clothes because she had disgraced his name and he wanted to disgrace her. He denied making sexual advances toward her.
The appellant testified that he didn't mean to shoot Lee and he hit Duncan because he panicked.
The State presented several witnesses on rebuttal, including a clinical psychologist, to refute the appellant's allegations that he was insane at the time these offenses were committed.

I
The appellant contends the trial court erred in failing to quash the jury because the State allegedly used some of its peremptory strikes to exclude blacks from the jury on the basis of race, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
The State used sixteen of its twenty-two strikes to exclude all of the black venire members from the jury. However, one black did serve as an alternate juror. Although the trial judge in this case did not make a specific determination that a prima facie case of discrimination had been established by this appellant, she allowed the State to explain its use of peremptory strikes for the record.
"We follow the rule that, when the prosecution's explanations for its strikes are of record, we will review the trial court's *460 findings of discrimination vel non, even though there has been no express finding by the trial court that a prima facie case has been established. Currin v. State, 535 So.2d 221 (Ala.Cr.App.1988). See also United States v. Forbes, 816 F.2d 1006 (5th Cir.1987). In other words, when the trial court calls upon the prosecutor for an explanation, without expressly finding a prima facie case, we will proceed directly to evaluate the sufficiency of the ensuing explanation. Where the trial court requires the prosecution to explain its peremptory challenges without first finding the existence of a prima facie showing of discrimination, we may fairly conclude that `the inquiry implied such a finding, and shifted the burden of justification to the prosecutor.' People v. Turner, 42 Cal.3d 711, 714-715, 230 Cal.Rptr. 656, 660, 726 P.2d 102, 106 (1986)."
Williams v. State, 548 So.2d 501 (Ala.Crim. App.1988).
The State provided explanations for all of its peremptory strikes of both blacks and whites from the venire. In brief, the appellant alleges that the State did not provide a valid non-discriminatory explanation for six of the sixteen blacks who were struck from the jury. The following excerpts from the record are the State's explanations with reference to the six venire members whom the appellant claims were excluded on racial grounds.
"Juror number 57, Irene Lesure, we struck because of the recommendation of our expert based on his investigation of her general intelligence level. Her age also. She was opposed to capital punishment. We had information from sources from the community that we had contacted that there was a general reputation that was not good and there was a strong recommendation from our sources that she be a must strike."

(R. 1278-79).
"We struck juror number 31, Edith Ferguson, a black female born in 1929. She had requested not to serve. Our expert recommended that she be struck based on his examinations of her from the various points I have already made reference to. She was a school crossing guard and made repeated requests in the course of voir dire not to serve in this case. We felt that she needed to be struck."

(R. 1279-80).
"We struck juror number 62, William D. Miner. He was a teacher. We consider teachers as individuals who would be a matter for us to concern ourselves with in striking due to their social approach to dealing with people. The family generally reported to have been involved in some criminal activity previously. That information was given to us from sources as unpredictable. Defense attorney and his family were friends and associates. He related that he was actually teaching the defense attorney's daughter and had coached defense attorney's son and indicated that he felt that he knew the defense attorney very well. There seemed to be some question about his position on capital punishment. He indicated at one time that he was generally opposed to it, though could have performed that and on the second event indicated that hethe second question, he indicated that he could impose the death penalty."

(R. 1280-81).
"We struck juror number 17, Mollerose Carpenter, black female, who was a service representative at the Telephone Company. She was an individual who we had very little information on other than the fact that she was working at the Telephone Company. What we observed during the course of examination was reported to us at one point in time that she appeared to be upset or glaring at the parties from the District Attorney's Office and asking questions. She was divorced. There was some concern on our part about maintaining her as a juror, but not having any further information, recommended that level of striking, especially after Dr. Wright was struck, juror number 99. We felt we would be required to strike her."

*461 (R. 1283-84).
"Number 99, Dr. Willis Wright, Sr., was struck by us at the end of the striking process. Our problem with Dr. Wright was basically he knew the defense attorney well. He said his wife and son and worked together [sic]. We also knew Dr. Wright. We considered seriously maintaining him on the jury until such time as in the course of voir dire he approached the benchprior to striking the jury, he approached the bench and reported that he be off the case because he was leaving the next day for New Orleans and asked the Court to defer him. He discussed at the bench concerning conflicting civic duties, that both of these matters required his personage due to being civic responsibilities. After that conference, we felt he would be a very dissatisfied juror and might well blame us for leaving him on the jury and felt compelled to strike him if the defense didn't. We held him towards the very end and defense did not strike, so we did. It certainly put us in a quandary as to the striking of this juror until at the very end of the process."

(R. 1284).
"Juror number 106, Lemuel Jones, is a black male juror. We left him as an alternate at one point in the striking process prior to Dr. Wright's pronouncement. He was sought as perhaps a juror to be left on the entire panel. However, with Dr. Wright leaving, we felt we did not want to leave him individually. We were concerned about the fact that he was a teacher and we simply did not have any further information on Mr. Jones other than he was a teacher and that he seemed to know Dr. Wright. We did attempt and ask for a recess during the period to locate further information about Mr. Jones, attempting to make some emergency type phone calls, but were unsuccessful. We felt we had other choices which we did have clear information on and left him as an alternate."

(R. 1286).
The State asserted several reasons for striking Irene Lesure. Although age may be a valid explanation under certain circumstances, see Levert v. State, 512 So.2d 790 (Ala.Crim.App.1987), the State failed to demonstrate why Lesure's age was significant to this case. See Williams. Likewise, the State's reference to this prospective juror's general reputation would be an insufficient reason by itself. See Roman v. Abrams, 822 F.2d 214 (2d Cir. 1987). However, the fact that Lesure was opposed to capital punishment was certainly a valid race-neutral reason for excluding her from the jury panel. Certainly, the State would prefer not to have a juror who has general objections to the death penalty, the maximum sentence which could be imposed in this case. See Yarbough v. State, 732 S.W.2d 86 (Tex.Ct.App.1987).
Edith Ferguson was struck because she stated during voir dire that she did not want to serve on the jury. We find this to be a legitimate non-discriminatory explanation because a juror who willingly wishes to fulfill his or her civic duty is preferable to someone who does not want to serve on a jury. Furthermore, a white venire member was struck for this same reason. (R. 1283). This is an indication that the State's decision to strike Ferguson was not racially motivated. See Mathews v. State, 534 So.2d 1129 (Ala.Crim.App.1988); Ex parte Branch, 526 So.2d 609 (Ala.1987).
The explanation that William Miner was struck because he was a teacher is not, without more, a legitimate non-discriminatory reason. See Williams; Slappy v. State, 503 So.2d 350 (Fla.Dist.Ct.App.1987); aff'd, 522 So.2d 18 (Fla.1988), cert. denied, ___ U.S. ___, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988). However, Miner's relationship with defense counsel and his family and his general opposition to the death penalty are valid non-racial reasons for striking Miner. See Johnson v. State, 512 So.2d 819 (Ala. Crim.App.1987); Lewis v. State, 535 So.2d 228 (Ala.Crim.App.1988); United States v. Cartlidge, 808 F.2d 1064 (5th Cir.1987).
*462 The State's assertions that Mollerose Carpenter was struck because of her demeanor and because she was divorced (as was this appellant and his divorce from one of the victims in this case played a major role in this case) provided legitimate race-neutral reasons. See Levert; Cartlidge.
The State's explanation for striking Willis Wright, Sr., does not appear to be racially based. Wright was struck because he knew defense counsel and because he asked to be deferred from jury service.
Lemuel Jones was struck because he was a teacher and because the State did not have a lot of information on him. The State's assertion that it strikes teachers as a general rule because of "their [teachers'] social approach to dealing with people" (R. 1281) is totally insufficient to establish why a teacher, specifically Jones, would be biased against the State in this particular case. In fact, under the circumstances of this case (the murders took place in a school classroom), teachers would be just as likely to be biased in favor of the State. See Williams. The State's other explanation for striking Jones is somewhat weak but we find it to be sufficient because the State struck a white juror for the same reason (R. 1285). This fact indicates that the State's explanation was legitimate and the decision to strike Jones was not racially motivated. See Mathews; Branch.
After reviewing the State's reasons for the use of its peremptory strikes (including those not specifically challenged by the appellant) "individually and collectively", Williams, we conclude that the trial judge correctly denied this appellant's motion to quash the jury.

II
During the direct examination of Dee Ann Duncan, the following occurred:
"Q All right. At this point, had most of the students removed themselves from the classroom?
"A Yes.
"Q Do you know how much time had gone by?
"A I have no idea.
"Q Could you tell at that time what her status or condition was with clothing? Was she [Brown] clothed or unclothed, if you know?
"A I know she had nothing on her legs.
"Q She had been wearing blue jeans; is that correct?
"A Yes.
"Q As you saw him kicking her and telling her to get up, `Bitch,' what did you see or hear next? Just repeat it as best you recall.
"A All right. He told her to give it to him like she had used to. That she made his d___ hard and he repeated that several times.
"Q At that point, were you still at your desk playing possum?
"A Yes.
"Q Was he still at Connie?
"A Yes.
"Q Could you see anything he was doing at that point or did you pick your head back up?
"A I closed my eyes because at that point I thought he was going to rape her." (R. 781).
The appellant contends, citing Armstead v. State, 57 Ala.App. 459, 329 So.2d 150 (1976), that Duncan's statement, "I closed my eyes because at that point I thought he was going to rape her" should have been excluded. In Armstead, this court held that "a witness cannot testify as to what another person saw, or what another person seemed to be doing, as such is a mere conclusion, and not a statement of fact." Armstead, 57 Ala.App. at 462, 329 So.2d 150 (citations omitted).
"It has been the traditional rule in Alabama that a lay witness can testify to facts which he observed but cannot testify to opinions, conclusions, deductions or inferences which are based upon facts. C. Gamble, McElroy's Alabama Evidence § 127.01(1) (3rd Ed. 1977). This general rule has been criticized as being unrealistic and assuming a low mentality and gullibility in jurors. C. Gamble, McElroy's Alabama Evidence § 127.01(3) (3rd Ed. 1977). One such exception, *463 which we find applicable here, is the `collective fact' or `shorthand rendition of fact' exceptions. Murrell v. State, 377 So.2d 1102, 1106 (Ala.Cr.App.), cert. denied, 377 So.2d 1108 (Ala.1979).
"`A witness may testify to his opinion if it is a collective fact or a shorthand rendition of fact. This variety is most commonly referred to as the collective fact exception and arises when the facts observed by the witness are so many or so inexpressible that he is allowed to give the jury his opinion. His opinion is conceived of as being a shorthand way of giving the facts and, consequently, does not constitute a violation of the opinion evidence rule. When the witness is asked, for example, if a particular person was drunk, this is considered permissible as a shorthand way of expressing several well known facts or characteristics.'
"C. Gamble, McElroy's Alabama Evidence § 127.01(3) Variety No. 7 (3rd Ed.1977)."
Wyrick v. State, 409 So.2d 969, 972-73 (Ala.Crim.App.1981), cert. denied (Ala. 1982).
"Consequently, a witness, who has had an opportunity to observe (sees, hears, feels, tastes, or smells, Fox v. Order of United Commercial Travelers of America, 192 F.2d 844 (5th Cir.1952)) the facts concerning which he is to testify, may testify on his `belief', his `best recollection', or his `understanding'. A witness may also testify that something `looked like' or `seemed like' something. McElroy, §§ 115.01(2)."
Butler v. State, 373 So.2d 347, 349 (Ala. Crim.App.1979).
Duncan testified that she saw the appellant "at" Brown and saw that Brown was naked from the waist down. She also stated that she heard the appellant's statements to Brown. Certainly these observations provided a logical and rational basis for Duncan's opinion that she thought that the appellant was going to rape Brown.
Thus, the trial judge properly allowed Duncan's statement into evidence. We must also note that no objection was made to Duncan's statement by defense counsel.

III
The appellant also contends that several statements made by Ferrin Eiland should not have been admitted into evidence. These statements were made during Eiland's cross-examination by defense counsel. The pertinent part of the record is as follows:
"Q Would you tell the jury at the time that you observed the Defendant between the legs of Connie Brown or at any time that you observed the Defendant, did you see him make any contact with Connie Brown of a sexual nature?
"A I assumed that what he was doing was of a sexual nature.
"Q But you have described an act of violence. Did you see anything that would suggest a sexual passion or sexual anything that would not be violent in itself?
"A I did not observe him, you know, committing intercourse or anything like that, but I assumed that that was what he was going to do.
"Q But you did not see him do anything?
"A No."

(R. 483-84).
The same reasoning we used with regard to Duncan's statements, reference Issue II, is applicable to Eiland's statements also. On direct examination, Eiland testified that he saw the appellant kneeling between Brown's propped-up and parted knees. Brown was completely naked at the time. Eiland's assumption that the appellant was doing something of a sexual nature was merely a "collective fact" or a "short-hand rendition of fact." See Wyrick.
Furthermore, even if the admission of Eiland's statements was error, it was invited error. Defense counsel asked Eiland if the appellant was doing anything of a sexual nature. Eiland responded that he assumed what the appellant was doing was of a sexual nature. "[E]rror cannot be *464 predicated upon admission of testimony which was elicited by defense counsel and was responsive to defense questions." Lacy v. State, 484 So.2d 1192, 1195 (Ala. Crim.App.1986). See also Crawford v. State, 485 So.2d 391 (Ala.Crim.App.1986); Timmons v. State, 487 So.2d 975 (Ala. Crim.App.), cert. denied (Ala.1986).

IV
During the direct examination of the appellant by defense counsel, the following occurred:
"Q Did you come to a conclusion in your mind as to why Connie told you that she was pregnant?
"MR. GREENE: Objection, self-serving.
"THE COURT: Sustained.
"MR. BOYNTON: Your Honor, for the record, I would like to say that I'm only asking what was his mental process, which I think is relevant.
"MR. SULLIVAN: We object." (R. 919)
The appellant now asserts that the trial court improperly sustained the State's objection to defense counsel's question concerning why Brown told the appellant she was pregnant. The appellant argues that his answer to defense counsel's question would not have been self-serving.
"The trial court's sustention of either a specific or general objection will be affirmed on appeal if the evidence excluded was subject to any legal objection even though such objection was not specified." Green v. State, 398 So.2d 376 (Ala.Crim. App.), cert. denied, 398 So.2d 380 (Ala. 1981) (quoting C. Gamble, McElroy's Alabama Evidence, § 426.01(13) (3d ed. 1977)).
In Flanagan v. State, 369 So.2d 46 (Ala. Crim.App.1979), this court held that the trial court properly sustained an objection to a question of a witness concerning why her husband beat her because "[a] witness may not testify to the uncommunicated mental operation of another." Flanagan, 369 So.2d at 50 (citations omitted). In the case at bar, the trial judge properly sustained the State's objection to defense counsel's question (as to why Brown told the appellant she was pregnant) because the question called for testimony by the appellant concerning the mental operation of Brown.
"If a trial court's ruling is correct for any reason it will not be reversed on appeal." Duncan v. State, 436 So.2d 883, 903 (Ala.Crim.App.), cert. denied (Ala. 1983), cert. denied, 464 U.S. 1047, 104 S.Ct. 720, 79 L.Ed.2d 182 (1984).

V
Count I of the indictment reads as follows:
"The Grand Jury of said County charge that before the finding of this indictment Earl Jerome McGahee, whose name is otherwise unknown to the Grand Jury other than as stated, did intentionally cause the death of Connie Brown by blunt force trauma to her head and Earl Jerome McGahee caused said death during the time that Earl Jerome McGahee did subject or attempt to subject, Connie Brown to sexual contact by forcible compulsion in violation of Section 2(a)(8) of Act No. 81-178, against the peace and dignity of the State of Alabama."

(R. 1366).
The appellant contends on appeal that the State did not prove that he subjected or attempted to subject Connie Brown to sexual contact by forcible compulsion.
Sexual conduct is defined as "[a]ny touching of the sexual or other intimate parts of a person not married to the actor, done for the purpose of gratifying the sexual desire of either party." Ala.Code § 13A-6-60(3) (1975).
"Common use of the English language would indicate that the term `intimate parts,' in the context of the statute, refers to any part of the body which a reasonable person would consider private with respect to touching by another." Parker v. State, 406 So.2d 1036, 1036 (Ala.Crim.App.), cert. denied, 406 So.2d 1041 (Ala.1981)."
Nails v. State, 549 So.2d 572 (Ala.Crim. App.1989).
*465 In Nails, we found sufficient evidence of an intimate touching where the defendant touched the middle part of the victim's leg and pulled her legs apart. In this case, Dana Andrews testified that she saw the appellant in the classroom with Brown and "he had her legs lifted up with his left arm and he had his right arm, he was pulling her panties off." (R. 474). Ferrin Eiland stated that, when he looked inside the classroom, Brown was lying on the floor naked with her legs propped up and parted and the appellant was kneeling between her legs. These facts are more than sufficient to establish a touching of "intimate parts."
The appellant seems to argue that the sexual contact, if any, was done to punish or demean Brown and not for the purpose of sexual gratification. This argument is ludicrous. Dee Ann Duncan heard the appellant say to Brown, "give it to me like you had used to" and "you make my d___ hard" (R. 781). Certainly the jury could have inferred, from Duncan's testimony and from the appellant's acts themselves, that the appellant committed these acts for the purpose of sexual gratification. See Nails.
The evidence established that the appellant and Brown were not married at the time of this offense. The fact that the sexual contact was by forcible compulsion is without question. Thus, there was sufficient evidence presented by the State that the appellant subjected or attempted to subject Brown to sexual contact by forcible compulsion.

VI
All three of the members of the Lunacy Commission examined the appellant at the Taylor Hardin Secure Medical Facility and found him to be competent to stand trial. Two of these psychiatrists also examined the appellant as to his competency at the time of the offense and both found him to have been sane at the time this offense was committed. The other psychiatrist testified at trial that his examination of the appellant did not include an evaluation of the appellant's sanity at the time of this offense.
The appellant contends that this psychiatrist's failure to evaluate his sanity at the time of the offense denied him due process of the law. This argument is without merit. In Holmes v. State, 505 So.2d 1308 (Ala.Crim.App.1987), the defendant alleged that the psychiatric report was deficient because it did not state that he was sane at the time of the offense. This court held in Holmes that,
"[w]hen, as in the case before us, it affirmatively appears that the defendant is presently sane and competent to stand trial (notwithstanding the fact he may have been insane when he committed the act charged) there is no barrier to proceeding with the trial."
Holmes, 505 So.2d at 1310 (quoting Hopkins v. State, 429 So.2d 1146 (Ala.Crim. App.1983)).
Since all three of the psychiatrists found the appellant competent to stand trial, we find no basis for a claim that the appellant's due process rights were violated because one of the psychiatrists did not determine the appellant's sanity at the time of the offense.
Furthermore, since two of the psychiatrists found the appellant sane at the time of the offense, the recommendation of the Lunacy Commission would have been the same even if the other psychiatrist had examined the appellant and determined that he was insane when he committed this offense. Moreover, this psychiatrist testified at trial and the jury was made aware that he did not evaluate the appellant's sanity at the time of the crime.
The appellant also argues that the three psychiatrists spent an inadequate amount of time evaluating the appellant and, thus, the judge's and the jury's decisions concerning the appellant's insanity at the time of this offense and his competency to stand trial were based on incomplete information. This argument, too, lacks merit. "The degree of opportunity that the witness may have had for forming an opinion goes to the weight of the evidence and not to its admissibility." Daniel v. State, *466 439 So.2d 206 (Ala.Crim.App.1983) (citation omitted).
The defense called each of the psychiatrists to testify and they testified as to how much time they spent evaluating this appellant and how long he remained at Taylor Hardin under observation. Obviously, the trial judge and the jury found that the psychiatrists' evaluations had a proper basis and were adequate in length to justify their conclusions.

VII
On September 4, 1986, just days before the trial of this case began, defense counsel filed a motion with the trial court requesting permission to take a deposition of Dr. Glen King. This motion reads as follows:
"Comes now your defendant, EARL JEROME McGAHEE, through and by his attorney, Bruce Boynton, and moves this honorable Court to allow him to take, at the expense of the State of Alabama, the deposition of Dr. Glen King, a clinical psychologist located in Auburn, Alabama, as an expert witness for the defendant in this cause which is scheduled for September 8, 1986 for the following reasons, to-wit:
"1. That the recently appointed psychiatrist, Dr. Elizabeth Sapala, notified the attorney for the defendant, on the evening of September 3, 1986 that the M.M.P.I. test administered to the defendant by the Lunacy Commission had serious flaws and was defective for the purposes of testing the defendant in the areas that it purported to test the defendant;
"2. That the said Dr. Sapala admitted that she was not an expert in this particular area of testing and recommended that Dr. Glen King, a Ph.D. in the field of clinical psychology and this nation's leading expert on the M.M.P.I. test be consulted as it concerns the test administered to the defendant;
"3. That the said attorney did contact Dr. King, who was familiar with the test given to the defendant, and he stated that the said M.M.P.I. test was defective but that he would be unavailable to testify at trial here in Selma but could make himself available for a deposition;
"4. That a deposition of Dr. King can be taken on September 5, 1986, in Auburn, Alabama.
"5. That the attorney for the defendant has contacted National Home Video, Inc., a television video service here in Selma, Alabama who has expressed a willingness to video record and replay in Court the deposition of Dr. King at a cost of $45.00 per hour plus $.25 per mile travel cost.
"6. That the deposition of Dr. King is essential to the defense of your defendant, he has made no delay in presenting this matter to this honorable Court and the granting of this motion will not delay the trial of this cause."

(R. 1580-81).
On the same day this motion was filed, the trial court held a hearing on this motion. Defense counsel argued that the deposition of Dr. King was necessary to the defense for "purposes of cross-examination and for purposes of attacking the findings of the Lunacy Commission in that particular test." (R. 68). The prosecutor argued that the Lunacy Commission Report (including the M.M.P.I. results) had been available to Dr. Sapala for at least a month and she could have alerted the trial court much earlier of any problems which she had with the Report. The prosecutor objected to scheduling a deposition four days prior to trial since he was involved in his preparation for the trial at bar. He also pointed out that the deposition would not be admissible at trial unless there was proof that Dr. King would be unavailable to testify at trial and the only evidence of his unavailability was defense counsel's assertions to this effect. See Ala.Code, § 12-21-262 (1975) (depositions cannot be read into evidence at trial "if it appears that the witness is alive and able to attend court and within its jurisdiction").
The following is the trial court's discussion with defense counsel concerning her *467 reasons for denying the motion to depose Dr. King.
"THE COURT: As far as the Court's ruling as to this motion, first of all, the Court wants to note that there's been one continuance in this case because of Dr. Sapala. I understand that it was because of a death in her family and that she had no control over that situation. However, she has in this Court's opinion, had sufficient time to interview the Defendant and make any notations from the reports as filed. Now if she chooses to wait until five days before trial or a week before trial to look at the report that she was supposed to be assisting defense counsel in evaluating, then that's a matter that may need to be taken up as far as the Court's considering her for appointment in the future. The Court has a problem with her statement in paragraph one and two of the motion that she found flaws in the tests and that it's defective and then turn right around in paragraph two and say that she doesn't, is not an expert in that area of testing. So those are almost contradictory. She appears to be, and I realize that she's not here to testify and there's no affidavit attached to the motion, but she appears to be telling the Court two different things. That she does have a point in one paragraph and in the second one she doesn't have a point and you need to call in an additional doctor or expert.
"MR. BOYNTON: May I justI think I can explain that. The position of Dr. Sapala is that while she is a psychiatrist, she is not an expert in the field of testing as a psychologist would be.
"THE COURT: The Court's trying to get across the point that this lady has had that report and she is well aware of the procedure that Taylor Hardin uses and she knew that test would be in that report and if she wasn't capable of making an appropriate finding or using that test, then I think that she's had more than enough time to advise the Court of that three or four weeks ago than to wait until the eve of the trial and then suddenly decide that she's not an appropriate person to look at the report.
"Now let me jump down to paragraph five, there's a request here as to deposition being taken by video. The Court would deny that at this time and until such time as that would be shown to be a necessity or a necessary expense and that the expense as set out thereby, National Home Video, was shown to be reasonable and that other services, whether in Auburn area where the doctor is or in the local area, that those are competitive prices and that that's not an unreasonable expense thenwell, the Court really doesn't think that we have to get to that issue until this gentleman can be shown to be unavailable and I think Mr. Greene's argument is correct, that until such time as that there is a showing to the Court some reason why he should not be subpoenaed to Court, then the Court doesn't have authority to order that deposition or to allow that deposition to be in evidence.
"MR. BOYNTON: Am I to understand that I could possibly redo my motion at a later time upon a showing of his unavailability, but then, of course, if he's unavailable, I don't know when he would then be available for the deposition to be taken.
"THE COURT: That's not it. I'm saying that at this time I think that the motion is premature because there hasn't been any showing to the Court that he is not available. Now I understand and have no problem working with the gentleman if he has other scheduling engagements as to attempting to sit down with State and defense and give him a time certain to appear for the test or shift the order of your witnesses during the proceeding to make his appearance easier on him, but I think at this time, the motion is due to be denied.
"MR. BOYNTON: Your Honor, excuse me. What portion of that motion then would bewould you be denying?
"Now, I don't know, but my complete understanding is that he cannot come, if he had come, then would you then order the State of Alabama to pay for his expenses *468 to come to Selma or would that then be on the part of the defense to do it?
"THE COURT: I think then you would have to file for your extraordinary expenses and have it approved prior to his travel. You've got to show, you know, that heI think you'll have to show the Court that he's necessary and that the expenses that he's charging for travel are reasonable expenses.
"MR. BOYNTON: Yes, ma'am. One thing on that just for the information of the Defendant. As it relates to showing that his expenses are reasonable, I earlier heard you mention about how we would go into that with the National Home Video, but would you then be asking me to bring in experts who are in this field to testify that he
"THE COURT: I'm saying that if you come in here and ask the Court to grant x-amount of dollars for the gentleman and that it's not split up as to what his travel expenses are, his time, then I'm not going to pay the gentleman, or the State, or order the State to pay him to show up at 8:00 Monday morning and sit here until 6:00 Friday, you know, and to cover motel expenses and travel and all that time. I don't think that would be reasonable and I wouldn't even consider that.
"MR. BOYNTON: Thank you, very much."

(R. 75-78).
Section 12-21-260, Code of Alabama 1975 states,
"(a) The defendant may take the deposition of any witness who from age, infirmity or sickness, is unable to attend court or who resides out of the state or more than 100 miles from the place of trial, computing by the route usually traveled, or who is absent from the state or where the defense, or a material part thereof, depends exclusively on the testimony of the witness.
"(b) When the defendant desires to take the deposition of any witness under the provisions of subsection (a) of this section, he must make affidavit before some officer authorized to administer oaths, setting forth some one or more of the above causes for taking the deposition and that the testimony of the witness is material and must file with the clerk interrogatories to be propounded to the witness, a copy of which interrogatories must be served on the prosecutor or on the district attorney, if either of them is in the county. Such prosecutor or district attorney may, within a like period of 10 days, file rebutting interrogatories, at the expiration of which time or, if no cross-interrogatories are filed, at the expiration of 10 days from the filing of the interrogatories filed, and the deposition must be taken at such time and place as the commissioner may appoint. If neither the district attorney nor prosecutor is in the county, service of the interrogatories may be had by filing the interrogatories in the office of the clerk for 10 days." (Emphasis added).
After our review of § 12-21-260 and the trial court's reasons for denying the appellant's motion to depose Dr. King, this court is convinced the trial court did not abuse its discretion by denying this motion in question. See Weatherford v. State, 369 So.2d 863 (Ala.Crim.App.), cert. denied, 369 So.2d 873 (Ala.), cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 91 (1979).
The appellant further alleges that the trial court's failure to appoint Dr. King as an expert was a violation of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). In Ake, the United States Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." Ake, 105 S.Ct. at 1091-92 (emphasis added).
The appellant argues that a "psychiatrist's assistance" also includes the assistance of a psychologist. The Supreme Court's opinion in Ake is limited to a "psychiatrist's assistance." Whether an indigent *469 defendant has a constitutional right to State-provided non-psychiatric assistance has yet to be resolved by the United States Supreme Court. In the only case in which the Supreme Court has addressed the right to non-psychiatric assistance, Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the court stated,
"Given that petitioner offered little more than undeveloped assertions that the requested assistance would be beneficial, we find no deprivation of due process in the trial judge's decision. Cf. Ake v. Oklahoma, 470 U.S. 68, 82-83, 105 S.Ct. 1087, 1096-1097, 84 L.Ed.2d 53 (1985) (discussing showing that would entitle defendant to psychiatric assistance as matter of federal constitutional law). We therefore have no need to determine as a matter of federal constitutional law what if any showing would have entitled a defendant to assistance of the type here sought."
Caldwell, 105 S.Ct. at 2637 n. 1.
After reviewing the record in this case, we find that the appellant's due process rights were not denied by the trial court's failure to appoint Dr. King as an expert in this case. First of all, a psychiatrist, Dr. Sapala, was provided to assist the defense in this case and, thus, the trial court followed the principles set out in Ake. Secondly, we do not find a specific request by defense counsel to have Dr. King appointed as an expert in this case. Thirdly, and most importantly, defense counsel "offered little more than undeveloped assertions" that Dr. King's assistance would be beneficial to the defense.
Defense counsel alleged that Dr. King believed the M.M.P.I. test was defective but defense counsel did not explain in what regard the test was defective and how the M.M.P.I., if defective, would be significant to the issue of the appellant's insanity.

"Ake and Caldwell, taken together, hold that a defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. Rather, a fair reading of these precedents is that a defendant must show the trial court that there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial."
Moore v. Kemp, 809 F.2d 702, 712 (11th Cir.), cert. denied, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987). (Footnotes omitted).
We find that the appellant has failed to demonstrate to the trial court how Dr. King would have been of assistance to the defense or how denying him the assistance of Dr. King would result in a fundamentally unfair trial. Thus, this issue is without merit.

VIII
During the sentencing phase of the trial, the State introduced the testimony of Roy Brown, Connie Brown's brother. He testified that he was at work on the morning of September 11, 1985, when he learned that his sister had been shot by the appellant. Brown became upset and went home and got his father's shotgun. He then went out to the junior college, intending to use the gun on the appellant if he found out his sister had been seriously hurt. However, the appellant was not at the junior college when he got there and the police took his gun away from him when he arrived at the school.
Defense counsel objected to Roy Brown's testimony on the grounds that it did not tend to establish any of the statutory aggravating circumstances and was totally irrelevant to the sentencing proceedings. The State replied that Brown's testimony was introduced for the purpose of establishing the aggravating circumstance that "[t]he defendant knowingly created a great risk of death to many persons," as set out in § 13A-5-49(3), Code of Alabama 1975. The trial court allowed Brown's testimony into evidence. The appellant also raised and argued this issue in his motion for a new trial, which was denied by the trial court.
*470 On appeal, the State argues that Brown's testimony was relevant to prove the aggravating circumstance provided in § 13A-5-49(3). In its brief, the State alleges that,
"while the act by the victim's brother was not directly involved in the Appellant's actions at G.C.W.J.C., it was certainly forseeable and Appellant should have known that his actions would have repercussions and consequences. Retribution by the victim's brother was a logical consequence and such actions could have and very nearly did result in harm to a great many people. Had Ricky Roy [Brown] not been arrested but had been allowed to open fire with his loaded shotgun, even more tragedies could have been wrought and would have been the result of Appellant's acts. Thus, the testimony was relevant and admissible."
(Appellee's brief, p. 59).
We disagree with the State's argument as set forth for several reasons. First of all, we doubt that Brown's actions on that morning were "certainly forseeable" to this appellant at the time he committed these crimes. Secondly, Brown's actions did not constitute "a great risk of death to many persons." Brown only intended to shoot one person, i.e., this appellant. Thirdly, we do not see the relevancy of Brown's testimony in any context involving these sentencing proceedings.
At the time Brown testified, the State had already presented proof to establish that the appellant "knowingly created a great risk of harm to many persons." The evidence showed that the appellant fired shots inside a classroom with many students present. This was certainly sufficient proof of the aggravating circumstance set out in § 13A-5-49(3).
The State's introduction of Brown's testimony was an act of overkill and an attempt to inflame the jury by showing the reaction of a family member of the victim. We are of the opinion that this evidence was totally irrelevant to the sentencing of this appellant.
Furthermore, although not argued by the appellant, we believe Brown's testimony violated the principles set out in Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).
In Booth, the United States Supreme Court held that "the presence or absence of emotional distress of the victim's family, or the victim's personal characteristics" are not proper sentencing considerations in a capital case.
In its opinion the United States Supreme Court stated,
"that a jury must make an `individualized determination' of whether the defendant in question should be executed, based on `the character of the individual and the circumstances of the crime.' Zant v. Stephens, 462 U.S. 862, 879, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235 (1983) (emphasis in original). See also Eddings v. Oklahoma, 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982)."
Booth, 107 S.Ct. at 2532.
In making its sentencing decision in a capital case, "the jury is required to focus on the defendant as a `uniquely individual human bein[g].'" Booth, 107 S.Ct. at 2533 (quoting Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976)).
The United States Supreme Court stated that, when a jury is allowed to consider information concerning the personal characteristics of the victim or information concerning the emotional impact of the crime on the victim's family, the jury's focus shifts from the defendant to the victim and the family.
Thus, this type of "information is irrelevant to a capital sentencing decision, and... its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." Booth, 107 S.Ct. at 2533.
"One can understand the grief and anger of the family caused by the brutal murders in this case, and there is no doubt that jurors generally are aware of these feelings. But the formal presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the *471 case on the relevant evidence concerning the crime and the defendant."
Booth, 107 S.Ct. at 2536.
Thus, based on the reasoning of the Supreme Court in Booth, we hold that the admission into evidence of Brown's testimony was "constitutionally impermissible" and "totally irrelevant to the sentencing process." Booth, 107 S.Ct. at 2533.
While we recognize that the admission of this type of evidence could be subject to harmless error analysis, see Grossman v. State, 525 So.2d 833 (Fla.1988), cert. denied, ___ U.S. ___, 109 S.Ct. 1354, 103 L.Ed.2d 822 (1989), we cannot say, with fair assurance, that Brown's testimony was harmless in such a way that the jury's decision was not influenced by its admission. See Stain v. State, 273 Ala. 262, 138 So.2d 703 (1961); Renfroe v. State, 49 Ala. App. 713, 275 So.2d 692 (1973).
Recently, the Alabama Supreme Court held that the presentation of a presentence report, which contained victim impact information, to the trial judge during sentencing in a capital case was not error. See Ex parte Martin, 548 So.2d 496 (Ala. 1989). Martin is readily distinguishable from the case at bar because the irrelevant information in this case was considered by the jury itself during the sentencing phase, not just the trial judge.
The appellant's convictions for the two counts of capital offenses charged in the indictment are hereby affirmed.
However, the appellant's sentence of death is, hereby, vacated and this cause is reversed and remanded to the trial court with instructions that a new sentencing hearing be held consistent with our opinion in this case.
AFFIRMED IN PART, REVERSED AND REMANDED IN PART.
TAYLOR, P.J., and PATTERSON and McMILLAN, JJ., concur.
BOWEN, J., concurs in part, dissents in part, with opinion.
BOWEN, Judge, concurring in part, dissenting in part:
I concur in the majority's affirmance of the appellant's conviction of two counts of capital murder. I dissent from Part VIII of the majority opinion vacating the appellant's sentence of death and remanding this cause for a new sentencing hearing.
I agree with the majority that the testimony of Ricky Roy as to his actions after learning that the appellant had shot and injured his sister was irrelevant because it did not tend to prove the § 13A-5-49(3) aggravating circumstance. However, I do not believe it approached the extreme level of prejudice as the Victim Impact Statement considered in Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 2535, 96 L.Ed.2d 440 (1987). In Booth, the Court held that the presence of emotional distress of the victim's family and the personal characteristics of the victim are not proper sentencing considerations in a capital case because such information is likely to "divert the jury's attention away from the defendant's background and record, and the circumstances of the crime." Booth, 482 U.S. at 504-506, 107 S.Ct. at 2534. "[I]ts admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." Id., 482 U.S. at 503-504, 107 S.Ct. at 2533.
As the majority recognizes, the harmless error doctrine is applicable at the sentencing phase of a capital case. Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). I disagree with the majority's conclusion that the error in this case cannot be considered harmless.
In Booth, the Victim Impact Statement was five pages long. It contained the following detailed and specific facts indicating that the victims' family was irredeemably bereaved:
"The son, for example, said that he suffers from lack of sleep and depression, and is `fearful for the first time in his life.' App. 61.... The daughter said she also suffers from lack of sleep, *472 and that since the murders she has become withdrawn and distrustful. She stated that she can no longer watch violent movies or look at kitchen knives without being reminded of the murders.... Finally, the granddaughter described how the deaths had ruined the wedding of another close family member, that took place a few days after the bodies were discovered. Both the ceremony and the reception were sad affairs, and instead of leaving for her honeymoon, the bride attended the victims' funeral. The VIS also noted that the granddaughter had received counseling for several months after the incident, but eventually had stopped because she concluded that `no one could help her.' Id., at 63.
"The ... official who conducted the interviews concluded ... by writing:
"`It became increasingly apparent to the writer as she talked to the family members that the murder of Mr. and Mrs. Bronstein is still such a shocking, painful, and devastating memory to them that it permeates every aspect of their daily lives. It is doubtful that they will ever be able to fully recover from this tragedy and not be haunted by the memory of the brutal manner in which their loved ones were murdered and taken from them.'" Id., 482 U.S. at 499-532, 107 S.Ct. at 2531-32.
It also contained a commentary outlining "the victims' outstanding personal qualities and noted how deeply [the victims] would be missed."
"The VIS stated:
"`[T]he victims' son reports that his parents had been married for fifty-three years and enjoyed a very close relationship, spending each day together. He states that his father had worked hard all his life and had been retired for eight years. He describes his mother as a woman who was young at heart and never seemed like an old lady. She taught herself to play bridge when she was in her seventies. The victims' son relates that his parents were amazing people who attended the senior citizens' center and made many devout friends.' App. 59.
"`As described by their family members, the Bronsteins were loving parents and grandparents whose family was most important to them. Their funeral was the largest in the history of the Levinson Funeral Home and the family received over one thousand sympathy cards, some from total strangers.'" Id., 482 U.S. at 498-99, 107 S.Ct. at 2531 n. 3.
Finally, the Victim Impact Statement included family members' "opinions and characterizations of the crimes." Id., 482 U.S. at 507-08, 107 S.Ct. at 2535. The son stated that his parents were "butchered like animals." The daughter said she "could never forgive anyone for killing [her parents] that way," that "animals wouldn't do this," and "[s]he doesn't feel that the people who did this could ever be rehabilitated and she doesn't want them to be able to do this again or put another family through this." Id., 482 U.S. at 507-510, 107 S.Ct. at 2535-36.
In contrast to the Booth statements, Roy's testimony here was relatively brief and straightforward. Although it emphasized his understandable anger and desire to avenge his sister's shooting at the time of its occurrence, it did not include a description of protracted emotional distress following her death, an assessment of his sister's worthiness, or an opinion of the appellant's relative unworthiness. In short, Roy's testimony did not provide the jury with the emotionally-charged sympathetic appeal that the Booth jury had before it. In my judgment, while it was error to admit Roy's testimony, it was not reversible error because its admission was not likely to have diverted the jury's attention from the inquiry properly before them. Compare State v. Bell, 293 S.C. 391, 360 S.E.2d 706, 712-13 (1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 734 (1988) (testimony at penalty phase of capital case wherein two individuals stated that defendant's crime had made them "fearful" and victim's sister stated "she never went out of the house alone after her sister's abduction and murder" distinguished from Booth and found not to be error). See also People v. *473 Miranda, 44 Cal.3d 57, 241 Cal.Rptr. 594, 629, 744 P.2d 1127, 1162 (1987), cert. denied, Miranda v. California, 486 U.S. 1038, 108 S.Ct. 2026, 100 L.Ed.2d 613 (1988) (prosecutor's comments regarding effect of murder on victim's family held harmless beyond a reasonable doubt); People v. Ghent, 43 Cal.3d 739, 239 Cal.Rptr. 82, 739 P.2d 1250 (1987), cert. denied, Ghent v. California, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 261 (1988) (same).
I also note that the United States Supreme Court has granted the writ of certiorari to review the case of State v. Gathers, 295 S.C. 476, 369 S.E.2d 140, 143-44 (1988), cert. granted, South Carolina v. Gathers, ___ U.S. ___, 109 S.Ct. 218, 102 L.Ed.2d 209, dismissal denied, ___ U.S. ___, 109 S.Ct. 778, 102 L.Ed.2d 771 (1989), which may indicate a retreat from or a refinement of the 5-4 decision in Booth.
In Gathers, the South Carolina Supreme Court reversed a death sentence and remanded for a new sentencing proceeding because the prosecutor's closing argument at the sentencing phase violated Booth. 369 S.E.2d at 144-45. The victim in Gathers was a black minister on whose dead body were found a prayer card and a voter registration card. The State's attorney argued that the victim was "with the angels now" and the defendant "cared little about the fact that [the victim] was a religious person." He then read the lengthy and emotional prayer on the card found with the victim's body. The prosecutor also called the jury's attention to the voter registration card and commented that the victim "believed in this community. He took part." 369 S.E.2d at 144.
Even if the Court's granting of certiorari in the Gathers case does not indicate a coming retreat from the holding of Booth v. Maryland, the prejudicial impact of Brown's testimony here is still not so great as to constitute reversible error.
The evidence in Booth conveyed the suggestion that the defendant deserved the death penalty because the victims were "sterling members of the community," 482 U.S. at 505-506, 107 S.Ct. at 2534, and the defendant's act had resulted in continuing and irreparable harm to the victims' family. The closing argument in Gathers conveyed the suggestion that the defendant deserved the death sentence "because the victim was a religious man and a registered voter." 369 S.E.2d at 144. Here, Ricky Roy's testimony conveyed to the jury his own immediate rage and desire for vengeance upon hearing of his sister's being shot. It was not presented as a suggestion from a more objective third party as in Booth (the victim interviewer) or in Gathers (the State's attorney) that appellant deserved the death penalty because the victim's brother had an instantaneous urge for vengeance. Under the circumstances, I do not believe the jury's attention was diverted by Roy's testimony from its task of considering the defendant's individual blameworthiness in determining whether to impose the death penalty.
For these reasons, both the conviction and the sentence should be affirmed.